UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| MICHAEL KROMAR, SHERI ROSALIA, CHRISTOPHER TURTZO, JOSH STAMPS and RICHARD WARCHOL, Individually and on Behalf of All Others Similarly Situated, | : : : : | Civil Action No. 15-cv-3937 CLASS ACTION |
| Plaintiffs, | . : . | COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS |
| vs. | . : . : | |
| DELTA AIRLINES, INC., AMERICAN AIRLINES, INC., SOUTHWEST AIRLINES CO. and UNITED AIRLINES, INC., | . : . : . : . | |
| Defendants. | . : . : | |
| | x | DEMAND FOR JURY TRIAL |

Plaintiffs Michael Kromar, Sheri Rosalia, Christopher Turtzo, Josh Stamps and Richard Warchol (collectively, "Plaintiffs"), individually and on behalf of a class of all those similarly situated, bring this action for treble damages and injunctive relief against Delta Air Lines, Inc. ("Delta"), American Airlines, Inc. ("American"), Southwest Airlines Co. ("Southwest") and United Airlines, Inc. ("United") (collectively, "Defendants") for violations of the Sherman Antitrust Act ("Sherman Act") and the Clayton Antitrust Act ("Clayton Act").  Based on counsel's investigation, research and review of publicly available documents, on Plaintiffs' personal knowledge, and upon information and belief, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      Defendants' illegal conduct stems from a conspiracy to fix, raise, maintain and/or artificially inflate the price of airline tickets for domestic air travel on Defendants' aircrafts by, *inter alia*, suppressing or otherwise restricting "capacity" across their flight routes. The recent unprecedented consolidation in the airline industry from nine major carriers in 2005 to just four today has led to fewer and larger competitors that have coordinated a strategy of "capacity discipline," or restraining growth and reducing established service, including the number of available flights and passengers carried on their domestic flight routes.  In theory, reducing unused capacity can be an efficient decision that allows a company to reduce its costs, ultimately leading to lower consumer prices.  In the airline industry, however, Defendants' coordinated capacity discipline has resulted in fewer flights and higher fares, despite dramatically falling costs during the same period.

2.      On July 1, 2015, it was reported that the United States Department of Justice ("DOJ") confirmed an ongoing investigation into whether Defendants were colluding to limit flight routes and available seats, thus keeping airfares at artificially inflated prices.

3.      Plaintiffs bring this action on behalf of all persons or entities that purchased airline tickets for a domestic flight on Defendants' aircrafts (the "Class") at any time from July 6, 2011

through the present (the "Class Period"). But for Defendants' unlawful conduct, Plaintiffs and the Class would not have paid supracompetitive prices for airline tickets issued by Defendants. As a direct result of Defendants' illegal acts, Plaintiffs and the Class have suffered losses and damages to their business and/or property in the form of inflated prices for airline tickets. Additionally, Plaintiffs and the Class are threatened with further injury unless Defendants are enjoined from continuing the unlawful conduct alleged herein and from entering into any other combinations, conspiracies, and/or agreements having similar purposes and effects.

## JURISDICTION AND VENUE

4.      Plaintiffs' claim for injuries sustained by reason of Defendants' violations of §1 of the Sherman Act, 15 U.S.C. §1, are brought pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees.

5.      This Court has original federal question jurisdiction over the Sherman Act claim asserted in this Court, pursuant to 28 U.S.C. §§1331, 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

6.      Venue is proper in this judicial district pursuant to §§4(a) and 12 of the Clayton Act, 15 U.S.C. §§15 and 22, and 28 U.S.C. §1391(b), (c), and (d), because during the Class Period one or more of the Defendants resided, transacted business, were found, or had agents in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this district.

7.      Venue is also proper because plaintiff Kromar resides in this district. Additionally, each of the Defendants operates within the district and each of the Defendants serviced millions of domestic customers through John F. Kennedy International Airport ("JFK") and LaGuardia Airport –

both located in Queens – during the 12 months ended December 2014. Defendants Southwest and American also fly though MacArthur Airport, the airport in Islip, Long Island, also in this district.[1]

## THE PARTIES

8.      Plaintiff Michael Kromar is a resident of Queens, New York, and  purchased tickets directly from defendant Delta on February 21, 2015 for travel between New York City and Las Vegas.  He also purchased tickets from defendant United in 2014 for travel between New York City and San Francisco.

9.      Plaintiff Sheri Rosalia is a resident of San Diego, California, and purchased a ticket directly from defendant Southwest for travel between San Diego and New York in March 2015, among other purchases.

10.      Plaintiff Christopher Turtzo is a resident of Las Vegas, Nevada, and purchased a ticket directly from defendant Southwest during the Class Period.

11.      Plaintiff Josh Stamps is a resident of Denver, Colorado, and  purchased tickets directly from defendant Southwest on April 13, 2015 for travel between San Diego, California and Portland, Oregon.  He also purchased a ticket on June 21, 2013 from defendant United for travel between Chicago, Illinois and San Diego, California.

12.      Plaintiff Richard Warchol is a resident of Chesapeake, Virginia, and purchased airline tickets directly from defendants American, Delta, Southwest and United for travel between Norfolk, Virginia, and Las Vegas, Nevada, in 2013, 2014 and 2015.

---

[1]    During the 12 months ended December 31, 2014, Defendants serviced the following number of domestic customers through JFK and/or LaGuardia airports: Delta (over 18.69 million); American (over 8.5 million); United (over 3.6 million); Southwest (over 2.33 million). *See* Port Authority of NY & NJ, Monthly Summary of Airport Activity, (last visited July 3, 2015) *available at* https://www.panynj.gov/airports/traffic-statistics.html.

13.     Defendant Delta is a Delaware corporation with its headquarters located in Atlanta, Georgia.  Delta's largest hub is Hartsfield-Jackson Atlanta International Airport in Atlanta, but it also maintains hubs in New York's JFK and LaGuardia airports.  In 2008, Delta merged with Northwest Airlines to form what was then the largest commercial airline in the world.

14.     Defendant American is a Delaware corporation with its headquarters located in Fort Worth, Texas.  It is a subsidiary of American Airlines Group Inc., also a Delaware corporation with its headquarters located in Fort Worth, Texas.  In December 2013, American completed a merger with US Airways Group.  As a result, American is the world's largest airline by passengers flown, fleet size and revenue.  American has route network centers on nine hubs, including in New York's JFK and LaGuardia airports.

15.     Defendant Southwest is a Texas corporation with its headquarters located in Dallas, Texas.  Southwest airlines merged with AirTran in 2011 and took the name Southwest.  Southwest markets itself as a "low-cost" airline and flies to 94 destinations across the United States, including LaGuardia airport.

16.     Defendant United is a Delaware corporation with its headquarters located in Chicago, Illinois.  It is a wholly owned subsidiary of United Continental Holdings, Inc., a Delaware corporation with its headquarters located in Chicago, Illinois.  In 2010, United merged with Continental Airlines, taking the name United and forming one of the world's largest carriers.  During the Class Period, United had significant operations in LaGuardia and JFK airports.

## INTERSTATE TRADE AND COMMERCE

17.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the provision of airline passenger services transmitted interstate between and among offices of Defendants and their customers throughout the United States.

18.     Throughout the Class Period, Defendants transported substantial numbers of passengers, in a continuous and uninterrupted flow of interstate commerce, between various airports in the United States.

19.     Throughout the Class Period, Defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States.

## FACTUAL ALLEGATIONS

**Industry Background and Recent**
**Consolidation in the Airline Industry**

20.     The structure of the airline industry is conducive to coordinated and collusive behavior – few large players dominate the industry, each transaction is small and most pricing is readily transparent.  In fact, Defendants maintain a concentrated oligopoly and control up to 85% of domestic air travel routes.  But that has not always been the case.  In 2005, there were nine major airlines.  That year, US Airways and America West merged, creating US Airways.  In 2008, Delta and Northwest Airlines merged, taking the name Delta.  Two years later, in 2010, United and Continental merged to form the current-day United.  In 2011, Southwest and AirTran merged.

21.     Finally, in early 2013, after American and US Airways announced an $11 billion merger, the DOJ filed an antitrust lawsuit alleging that US Airways' acquisition of American would have substantially lessened competition for commercial air travel in local markets throughout the United States.  The companies eventually entered into a settlement with the DOJ that required the airlines to divest slots, gates and ground facilities at key airports around the country.  Following the settlement, American and US Airways completed their merger in December 2013.

22.     Increasing consolidation among large airlines, namely Defendants, hurts passengers. An August 2012 presentation from US Airways observed that industry consolidation has resulted in

"Fewer and Larger Competitors."[2] The structural change to "fewer and larger competitors" has allowed "[t]he industry" to "reap the benefits."[3] Those benefits to the industry were touted in the same presentation as including "capacity reductions."[4]

23.     A recent study of airline industry competition, prepared for the Travel Technology Association, concluded that there is minimal price and capacity competition among the major airlines, including those operated by Defendants.  The study found that, between 2013 and 2014 alone, the average fare per 100 miles increased by $50.  This happened even though the airlines enjoyed a 24% decline in the price of jet fuel and a 3% drop in operating costs.  In a properly operating market, these cheaper costs would drive prices down.

24.     Since the most recent period of consolidation began in 2008, airfares have mostly outstripped inflation.  At one point last year they were up 22%, as against an overall rise in consumer prices of 12%, according to the Bureau of Labor Statistics.  According to Airlines for America (an industry trade association), fuel accounted for 27.6% of operating costs in the last quarter of 2014.  As the following depiction demonstrates, U.S. airfares are routinely much higher than inflation:

---

[2]   DOJ Complaint, ¶35, *United States v. US Airways Group, Inc.*, No. 13-cv-01236 (D.D.C. Aug. 13, 2013) ("DOJ Complaint"), *available at* http://www.justice.gov/atr/cases/ f299900/299968.pdf.

[3]   *Id.*

[4]   *Id.*



David Yanofsky, *The United States is Investigating Airfare Price Collusion* (Jul. 1, 2015), *available*

*at* http://qz.com/443028/the-united-states-is-investigating-airfare-price-collusion/.

**Defendants Conspired to Increase Prices
by Artificially Limiting Flight Capacity**

25.      On June 11, 2015, *The New York Times* reported on a meeting of the International Air

Transport Association ("IATA") in Miami, which hosted the world's top airline executives,

including Defendants, and on their repeated use of the term "discipline," which the author described

as "classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins."[5]

For example, American's chief, Doug Parker, said the airlines learned their lessons from past price

wars, telling *Reuters* that "I think everybody in the industry understands that."[6]  Delta's president Ed

Bastian stated that Delta is "continuing with the discipline that the marketplace is expecting."[7]  Air

---

[5]      *See* James B. Stewart, *"Discipline" for Airlines, Pain for Fliers*, N.Y. Times (June 11, 2015), *available at* http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html?_r=0.

[6]      *Id.*

[7]      *Id.*

Canada's chief executive, Calin Rovinescu, stated, "[p]eople were undisciplined in the past, but they will be more disciplined this time."[8]  And United's CEO Jeff Sismek said earlier this year, while announcing his company had nearly doubled profits in 2014, that "'[w]e will absolutely not lose our capacity discipline,'" *i.e.*, the practice of limiting expansion in order to keep airfares high.[9]

26.     According to Fiona Scott Morton, professor of economics at Yale University and a former deputy attorney general in the antitrust division of the DOJ, "[w]hen airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity.  And when there aren't enough seats, airlines raise prices.  That's what we've been seeing."[10]  Christopher L. Sagers, an antitrust professor at Cleveland Marshall College of Law, agreed: "[T]hey're all but saying you need to limit output to keep up prices."[11]  As a result of such capacity discipline, IATA recently projected that airline industry profits would more than double in 2015 to nearly $30 billion.

27.     The industry's comments indicate existing collusion and plans to continue colluding. In particular, the airlines signaled to Southwest, which recently broke ranks and announced a planned 8% increase in its seating capacity, to limit capacity.  After the conference, Southwest quickly revised its projections and reassured investors it was not "going rogue," as its chief executive explained: "We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately 7 percent."[12]  The difference

---

8     *Id.*

9     Brad Tuttle, *The pathetic state of airline travel today was predicted long ago*, Fortune (Apr. 24, 2015), *available at* http://fortune.com/2015/04/24/state-of-airline-travel/.

10    Stewart, *supra*.

11    *Id*.

12    *Id*.

between 7% and 8% capacity growth for Southwest amounts to the ability to carry more than 1.3 million additional passengers in a year.[13]

28.     The Defendants' position on capacity has been disseminated, in part, by the trade group Airlines for America, to which all Defendants belong.  The group provides a forum for discussion of the airlines' position on capacity and on other topics.

29.     Throughout the Class Period, Defendants collectively kept seating capacity on domestic flights virtually unchanged, despite the increased demand which accompanies good economic times.[14]  From January 2010 to January 2014, capacity on domestic flights was virtually flat while the U.S. economy grew about 2.2% per year.  During the Class Period, Defendants filled a higher percentage of seats on planes and made a very public effort to slow growth in order to command higher airfares.  From January 2014 to January 2015, the airlines expanded by 5.5%, topping the economy's 2.4% growth for 2014.  By not increasing capacity to respond to consumer demand, the airlines were able to charge exorbitant ticket prices, which rose an inflation-adjusted 13% from 2009 to 2014 according to the U.S. Bureau of Transportation Statistics.

30.     Increased ticket prices have led to record profits despite falling costs.  U.S. airlines earned a combined $19.7 billion in the past two years and IATA's $30 billion projection for 2015 is bolstered by the dramatic drop in the price of jet fuel, which is the airlines' single highest expense. In April 2015, U.S. airlines paid $1.94 a gallon, down 34% from the year before.  As long as capacity is limited, there is no incentive for airlines to reduce fares, regardless of how low fuel prices drop.  As Ms. Morton explained, "on most airline routes, consumers have very little choice," and not

---

[13]     Southwest, http://swamedia.com/channels/Corporate-Fact-Sheet/pages/corporate-fact-sheet# funfacts (last visited July 6, 2015) (noting that Southwest flew 136 million passengers last year).

[14]     *See* Fiona Scott Morton, R. Craig Romaine & Spencer Graf, *Benefits of Preserving Consumers' Ability to Compare Airline Fares* (May 19, 2015), *available at* http://www.traveltech.org/wp-content/uploads/2015/05/CRA.TravelTech.Study_.pdf.

until "the recent wave of consolidation among airlines have they been able to set prices significantly

above marginal cost."[15]

31.     In the absence of collusion, cost savings due to decreased expenses, including jet fuel

expenses, would be passed on to consumers in the form of decreased prices for airline tickets.  But as

Defendants' costs have plummeted, the prices Defendants have charged Plaintiffs and the Class have

skyrocketed.

**Senators Schumer and Blumenthal Urge
the DOJ to Investigate Defendants' Conduct**

32.     In December 2014, U.S. Senator Charles Schumer of New York called for a federal

investigation of U.S. airlines amid falling gas prices.  Senator Schumer stated:

> At a time when the cost of fuel is plummeting and profits are rising, it is curious and
> confounding that ticket prices are sky-high and defying economic gravity . . . .  The
> industry often raises prices in a flash when oil prices spike, yet they appear not to be
> adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up
> like a rocket and come down like a feather.[16]

As a result, Senator Schumer urged the federal government to conduct a price investigation.

33.     In June 2015, U.S. Senator Richard Blumenthal of Connecticut asked the DOJ to

immediately investigate collusion and anti-competitive behavior amongst U.S. airline companies

following a meeting of top executives at the IATA annual conference and the related article in *The

New York Times* exposing Defendants' capacity discipline.[17]

34.     In his letter to Assistant Attorney General William Baer, Blumenthal cited the DOJ's

complaint seeking to block the American and US Airways merger in 2013, stating:

---

[15]   Stewart, *supra*.

[16]   Andrew Ross Sorkin, *As Oil Prices Fall, Airfares Still Stay High* (Mar. 23, 2015), *available at*
http://www.nytimes.com/2015/03/24/business/dealbook/as-oil-prices-fall-air-fares-still-stay-
high.html.

[17]   *See* Stewart, *supra*.

> *Most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins*.  In light of the recent unprecedented level of consolidation in the airline industry, *this public display of strategic coordination is highly troubling.*

*     *     *

> In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior . . . the legacy airlines closely watch the pricing moves of their competitors.  When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."

> To bring home the point, the Complaint follows, "Coordination becomes easier as the number of major airlines dwindles and their business models converge."

> I agree.  I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. *Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior.*

Press Release, Citing Unprecedented Consolidation within Airline Industry, Blumenthal Urges DOJ to Investigate Potential Anti-Competitive, Anti-Consumer Behavior and Misuse of Market Power (June 17, 2015), available at http://www.blumenthal.senate.gov/newsroom/press/release/citing-unprecedented-consolidation-within-airline-industry-blumenthal-urges-doj-to-investigate-potential-anti-competitive-anti-consumer-behavior-and-misuse-of-market-power (emphasis added).

**The DOJ Investigation**

35.     On July 1, 2015, the DOJ confirmed that it was investigating potential unlawful coordination among the airlines.  The *Associated Press* ("*AP*") first reported on the investigation, which it described as involving "possible collusion among major airlines to limit available seats, which keeps airfares high."[18]  The *AP* article reported that the investigation "appears to focus on

---

[18]   *See* David Koenig, Scott Mayerowitz and Eric Tucker, *US probing possible airline collusion that kept     fares     high* (July     1,     2015),     *available     at* http://bigstory.ap.org/article/fbe53033dd424612974b0c0f8c19910e/justice-department-investigating-potential-airline.

whether airlines illegally signaled to each other how quickly they would add new flights, routes and extra seats."[19]  DOJ spokeswoman Emily Pierce confirmed that the DOJ is looking into potential "'unlawful coordination' among some airlines."[20]

36.     Ms. Pierce confirmed that the department sent Civil Investigative Demand ("CID") letters to airlines on June 30, 2015, and Defendants have each confirmed that they are part of the probe and have received a letter from the DOJ.  American stated that the CID it received seeks documents and information from the last two years that are related to statements and decisions about airline capacity.[21]  The DOJ issues CIDs only when there is "reason to believe" that a violation within the Division's scope of authority has occurred.[22]  The investigation began approximately two months ago.  *The Wall Street Journal* has reported that the DOJ has requested documents from airlines related to expansions, as well as documents related to meetings with analysts or officials at other airlines.

37.     The news of the investigations has been well received by industry experts.  "The number one concern that antitrust experts have – with no close second – as with regard to radical consolidation of any industry, is the risk of tacit competitor coordination on policies, practices and prices among a reduced number of industry participants," said Business Travel Coalition Chairman

---

[19]   *Id*.

[20]   *Id*.

[21]   Also on July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office is conducting a similar investigation into collusive activity among the airlines and had sent letters to Delta, United, American and Southwest. "It appears that the major airlines have uniformly decided not to increase capacity - perhaps in an effort to keep ticket prices high and maintain their record profit margins, all at the expense of consumers," Jepsen said in the letters.  Karen Fairfield and Soyoung Kim, *Connecticut probes for airlines over possible antitrust violations* (July 1, 2015) *available at* http://www.thefiscaltimes.com/latestnews/2015/07/01/Connecticut-probes-four-airlines-over-possible-antitrust-violations#sthash.At8HLfPr.dpuf.

[22]   *See* The United States Dept. of Justice, Antitrust Division Manual III-45 5th ed. (Apr. 2015).

Kevin Mitchell.  "Since recent U.S. airline mega-mergers, we have witnessed near constant airline

CEO calls for 'capacity discipline' during industry gatherings and analyst earnings calls only to be

echoed by analysts in follow-on earning calls with other airlines.  This represents perhaps the darkest

hours of airline coordination as well as a too-cozy harmonization between airlines and Wall

Street."[23]

**Defendants' History of Anticompetitive Behavior**

38.     Defendants have a history of engaging in express, coordinated behavior in the airline

industry.  For example, all airlines have complete, accurate, and real-time access to every detail of

every airline's published fare structure on every route through the airline-owned Airline Tariff

Publishing Company ("ATPCO").  One airline has called ATPCO "a dedicated price-telegraph

network for the industry."[24]  The airlines use ATPCO to monitor and analyze each other's fares and

fare changes and implement strategies designed to coordinate pricing.  For example, in 1992, the

United States filed a lawsuit to stop several airlines, including defendant American, from using their

ATPCO filings as a signaling device to facilitate agreements on fares.  That lawsuit resulted in a

consent decree which has since expired.

39.     Additionally, US Airways, which has since merged with American, communicated

directly with a competitor when it was upset by that competitor's efforts to compete more

aggressively.  In 2010, one of US Airways' larger rivals extended a "triple miles" promotion that set

off a market share battle among defendants Delta, United and American.  The rival airline was also

expanding into new markets and was rumored to be returning planes to its fleet that had been out of

---

[23]   Adam Leposa, *U.S. Justice Department Launches Airline Antitrust Probe* (July 2, 2015),
*available at* http://www.travelagentcentral.com/air-travel/us-justice-department-launches-airline-
antitrust-probe-52146.

[24]   DOJ Complaint, ¶44.

operation during the recession.  US Airways' CEO complained about these aggressive maneuvers,

stating to his senior executives that such actions were "hurting [the rival airline's] profitability – and

unfortunately everyone else's."[25]  US Airways' senior management debated over email about how

best to get the rival airline's attention and bring it back in line with the rest of the industry.  In that

email thread, US Airways' CEO urged the other executives to "portray[ ] these guys as idiots to Wall

Street and anyone else who'll listen."[26]  Ultimately, US Airways' CEO forwarded the email chain –

and its discussion about how aggressive competition would be bad for the industry – directly to the

CEO of the rival airline.

40.     The DOJ ultimately settled the case, allowing the merger to occur, but conditioned

settlement on the divestiture of certain flight slots and other relief, including maintaining certain

hubs for a period of years.  The merger is complete, and the airline industry is now even more

consolidated.

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the

Federal Rules of Civil Procedure.  Plaintiffs seek to certify a class action under federal antitrust laws

on behalf of:

> All persons and entities who purchased a ticket directly from any of the Defendants
> (excluding any Defendants, their employees, and their respective parents,
> subsidiaries and affiliates) (the "Class") from July 6, 2011 to present (the "Class
> Period").

42.     Due to the nature of the trade or the commerce involved, Plaintiffs do not know the

exact number of Class members involved; however, Plaintiffs believe that Class members are in the

---

[25]   *Id*., ¶45.

[26]   *Id*.

many thousands and possibly millions and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

43.     Plaintiffs are members of the Class, Plaintiffs' claims are typical of the claims of the Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs and Class members purchased tickets from Defendants at artificially maintained, supracompetitive prices established by the actions of the Defendants in connection with the restraint of trade alleged herein.  Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class.

44.     Plaintiffs are represented by counsel who are competent and experienced in the prosecution of complex class action litigation.

45.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

46.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages, and restitution.  Among the questions of law and fact common to the Class are:

(a)     whether the Defendants and their co-conspirators colluded to fix, raise, maintain, and/or stabilize the airfares in the United States;

(b)     whether Defendants violated §1 of the Sherman Act;

(c)     the duration of the conspiracy alleged in this Complaint;

(d)     the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)       whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages; and

(f)       whether Plaintiffs and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of §1 of the Sherman Act.

47.       A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this Complaint.  This Class action likely presents no difficulties in management that would preclude maintenance as a class action.  Finally, the Class is readily ascertainable.

48.       The claims asserted herein are also appropriate for class certification under the laws of each of the states under which claims are asserted.

## COUNT I

### Violation of Section 1 of the Sherman Act

49.       Plaintiffs reallege and incorporate by reference all the above allegations as if fully set forth herein.

50.       During Class Period, Defendants engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of §1 of the Sherman Act (15 U.S.C. §1) by artificially reducing or eliminating airfare competition and engaging in a conspiracy to artificially fix, raise, maintain, and/or stabilize the prices for flights in the United States.

51.       In particular, Defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of airfares in the United States.

52.     In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of airfares for flights in the United States.

53.     Defendants' combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among Defendants.

54.     Defendants' conspiracy had the effect of artificially inflating the airfares charged in the United States.

55.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class paid more for airfares than they otherwise would have paid in the absence of Defendants' unlawful conduct.

56.     By reason of Defendants' unlawful conduct, Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of air travel.

57.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and damaged in their business and property in an amount to be determined.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.     This action may proceed as a class action, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.     Defendants have engaged in a combination and conspiracy in violation of §1 of the Sherman Act (15 U.S.C. §1), and Plaintiffs and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C.      Plaintiffs and the members of the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.      Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable by jury.

DATED:  July 6, 2015                  ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      DAVID A. ROSENFELD
                                      VINCENT M. SERRA


                                            s/David A. Rosenfeld
                                      _____
                                      DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
drosenfeld@rgrdlaw.com
vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
mdearman@rgrdlaw.com

*Attorneys for Plaintiff*

I:\Admin\CptDraft\Antitrust\CPT Airlines Complaint_EDNY.docx